# A. J. VEIGEL v. MICHAEL O'TOOLE AND OTHERS.[1]

May 22, 1931.

Nos. 28,386, 28,387.

*George S. Grimes* and *Ben R. Toensing,* for appellants.
*Daggett & Redlund,* for respondent.

HOLT, J.

The appeal is from an order denying a new trial after findings in favor of plaintiff.

[1]Reported in 236 N. W. 710.

There is no substantial dispute as to the facts involved. On May 22, 1917, defendants O'Toole and wife let by written lease to Frank A. Samels the front corner room of a building upon a certain lot in South St. Paul, Minnesota, for the term of 30 years from September 1, 1917, for the yearly rent of $2,400 during the first ten years, $3,000 a year for ten years thereafter, and $3,600 a year for the last ten years of the term, the rent to be payable in equal monthly instalments in advance. The leased premises were to be used "for carrying on a banking investment or other financial business or business incidental thereto, or any other lawful business." Of the many covenants to be performed by the lessee the following should be noticed:

"Whereas there is a mortgage on the real estate in which said leased premises is situated in the sum of thirty thousand dollars ($30,000), it is mutually agreed as a part of the consideration of this lease that in the event that the parties of the first part desire to pay off said mortgage that the party of the second part will furnish sufficient money therefor and take as security therefor the notes of the parties of the first part, secured by a first real estate mortgage on said real estate for a period of five (5) years, in such sum as may be necessary to pay off said mortgage * * *."

A written modification of this lease was executed on January 19, 1918, by both the lessors and the lessee, thereby including added space in the building and providing for certain improvements to be made by the lessee at his own expense. This modification also contained this:

"The parties of the first part hereby agree with the party of the second part that in the event that the parties of the first part desire to sell said building that the party of the second part shall have the refusal of the same at the highest price available therefor. This agreement shall run with the land and be binding upon said parties, their heirs, executors, administrators and assigns."

The lessee, Frank A. Samels, about the time the lease was executed undoubtedly contemplated establishing a bank in South St.

Paul to be located in the premises leased. His sons were to be interested in the bank as well as the lessor Michael O'Toole. In October, 1917, the Live Stock State Bank was organized, with Frank A. Samels as president, his son W. A. Samels, as cashier, and O'Toole as one of the directors. It occupied the premises leased for its banking business until March 3, 1923, when, with the approval of the commissioner of banks, it sold and transferred all its assets to the Drovers State Bank of South St. Paul, vacated the premises it had occupied, and ceased to pay rent to O'Toole and to collect rent from parties who occupied as subtenants. If the Drovers bank considered the leasehold an asset bought, it was unwilling to receive it and assume the liability. Frank A. Samels died in June, 1919. W. A. Samels thereupon became president until June 5, 1923, when he died. After the death of Frank A. Samels the representatives of his estate, on April 23, 1921, assigned the leasehold to Vogel, the cashier of the bank; but it is not claimed that this was intended for the bank. It is testified that Vogel at the same time assigned the lease to W. A. Samels and George Samels, and these latter assigned to Fred A. Samels. The two last named assignments are not produced, there being testimony that when on May 3, 1923, Vogel made an assignment to Fred A. Samels the prior two documents were destroyed. The transfer of the leasehold from the Frank A. Samels estate through intermediaries to Fred A. Samels was for the convenience of Frank A. Samels' heirs. The lease was never entered as an asset upon the books or records of the bank, nor is any reference thereto to be found in the minutes or transactions of the bank or of its board of directors. The lease and modification thereof were always in the possession of Frank A. Samels or members of his family. However the accounts of the bank show that O'Toole presented his pass book to the cashier of the bank and was credited therein with the rent specified in the lease, and the amounts so credited to O'Toole's deposit account in the bank were charged to the bank's expense account, and rent received from the basement tenant was credited to its profit account. It also appears that nearly $1,800 was expended in mak-

ing the changes authorized in the modification of the lease, which sum the bank paid and charged as expense.

When the bank sold its assets on March 3, 1923, and ceased business, the Frank A. Samels heirs began to negotiate with parties to sublet the premises, and on May 3, 1923, a lease was executed between Fred A. Samels and one Mattaini, which has ever since been in force. From April 1, 1923, the Samels have paid the rent to O'Toole and have collected the rent from Mattaini, and the difference between the rent paid and that received from Mattaini is $15,072.40.

The learned trial court's findings embody substantially the facts above stated, except these which are challenged as unsupported:

"That on or about the 19th day of January, 1918, said Frank A. Samels, for and in behalf of said corporation, but in his own name, entered into that certain modification of said lease, said modification being defendants' exhibit 3. That the premises covered by said lease and modification were thereafter for a long period of time occupied by said Live Stock State Bank and said bank thereafter proceeded to improve said premises and to make changes and modifications therein and during a part of said time to sublease certain parts of said premises and until proceedings were taken for the appointment of a receiver said bank paid all the rents due to said defendants Michael O'Toole and Ellen O'Toole, and collected all rents which were receivable from sublessees, under said lease and modification, and that said rents were paid from the funds of said bank and said rents received from sublessees were placed in and became a part of the funds of said bank, and that said bank intended to and did adopt said lease and modification."

The conclusions of law following this finding, to the effect that the bank adopted and made the lease its own, that it is the property of the bank, that plaintiff is entitled to possession thereof and to judgment against defendants Samels for $15,072.40, are also assailed.

The finding of fact quoted is not sustained, that the modification of January 19, 1918, was entered into by Frank A. Samels "for

and in behalf of said corporation," unless the facts above recited so warrant; and there is no evidence that the bank as such sublet any part, nor is there anything in the record warranting the finding "and that said bank intended to and did adopt said lease and modification," unless the facts hereinbefore stated so justify.

The lease, being for more than three years, was a conveyance under our statute. G. S. 1923 (2 Mason, 1927) § 8195. The court rightly declined to find that it was taken in trust in Samels' name. Conceding that the bank paid the rent or consideration, the one named as lessee took the leasehold estate. G. S. 1923 (2 Mason, 1927) § 8086. No creditors as of that time now exist, so as to allow plaintiff representing them to obtain relief under the next section (§ 8087). The law is that a corporation may adopt a contract made by its promoters prior to and with a view to its organization. Battelle v. N. W. C. & C. P. Co. 37 Minn. 89, 33 N. W. 327; McArthur v. Times Printing Co. 48 Minn. 319, 51 N. W. 216, 31 A. S. R. 653; Bond v. Pike, 101 Minn. 127, 111 N. W. 916, 917. In the case last cited it is said [101 Minn. 128]:

"It is the settled law of this state that a corporation is not bound by engagements on its behalf made by its promoters before its organization, but it may make them its contracts by adopting them. This it may do precisely as it may make similar original contracts; and if a similar contract might be made by the corporation without any formal act of its board of directors, the adoption of the contract of its promoters may be shown either by the express act of its board of directors, or it may be inferred from acts or acquiescence of the corporation or of its authorized agents."

It is probably true that a writing complying with the statute of frauds (G. S. 1923 [2 Mason, 1927] §§ 8459 and 8460) was not necessary in order to adopt the pre-existing lease. Ehrmanntraut v. Robinson, 52 Minn. 333, 54 N. W. 188. By taking possession, the obligations of a lessee to comply with the covenants of the lease is assumed at least during the occupancy of the premises. But this was a long-term lease prepared so as to require the signature of lessee as well as of lessors, and an adoption by the corporation

should partake somewhat of a novation so as to relieve the lessee named of his covenants. There also seems to be authority for the proposition that a lessee who has not signed the lease is not bound by the covenants therein. Hinsdale v. Humphrey, 15 Conn. 431; Johnson v. Muzzy, 45 Vt. 419, 12 Am. R. 214.

But, aside from any technical rules, it does not appeal to us that the facts above recited sustain the finding quoted that there was an adoption by the bank. It would seem that if there had been any intention to adopt the lease, either an assignment thereof from Samels or at least a resolution would have been adopted by the board of directors looking to the assumption of the lease and its obligations. But on the face of things good reasons appear why this should not be done. The covenant of the lessee to loan the lessor $30,000 effectively prevented the bank from adopting the lease. Such a covenant the bank could not assume because it would be ultra vires. With what hope of success could the lessors have begun an action against the bank while it was still doing business to enforce that covenant?

But that is not all. After the bank was fully organized and had been doing business for over two months, the written modification of the lease was executed on January 19, 1918, by the original parties to the lease. The bank did not participate therein nor then bind itself by resolution or by any writing whatever. This was no contract by promoters which it could adopt under any rule contended for. Samels had then ceased to be a promoter. The fact that the changes made in additional space acquired by the modification were paid by the bank does not give it a legal right to the leasehold on the claim that it furnished the consideration, for the statute (§ 8086) vested the rights acquired in Samels. In view of the provision contained in the modification looking to a purchase by Samels of the lot and building containing the leased premises, it is very clear that there was no thought in the mind of any officer of the bank that the bank should be a party to any covenants or provisions contained in the lease as modified.

This real estate was encumbered for $30,000, and it is fair to assume no sale would be made unless for a price substantially more

than the encumbrance. The record suggests that the whole capital stock of the bank was $50,000. It cannot be possible that it intended to become the buyer of this real estate, thereby investing practically all its assets therein. The bank could not adopt unless it could lawfully assume all the obligations Frank A. Samels had made to O'Toole. The reasonable view of the undisputed facts is that Frank A. Samels took the lease as his own; that there was not any intention to have the bank bound by its covenants or by the covenants of the modification; and that so long as Samels lived and the bank was a going concern he was willing to let it occupy the premises provided he did not have any expenses growing out of such occupancy. There would have been no occasion for this lawsuit had not the Samels heirs, after the bank vacated the premises, paid the rent to O'Toole and succeeded in making the profitable sublease with Mattaini that they did.

Respondent properly cites In re Quality Shoe Shop (D. C.) 212 F. 321; Saltonstall v. Mead, 191 Ill. App. 173; Thistle v. Jones, 45 Misc. 215, 92 N. Y. S. 113; Chase v. Redfield Creamery Co. 12 S. D. 529, 81 N. W. 951; Central Tr. Co. v. Lappe, 216 Pa. 549, 65 A. 1111. To these we may add Morgan v. Bon Bon Co. 222 N. Y. 22, 118 N. E. 205; In re Super Trading Co. (C. C. A.) 22 F. (2d) 480. As we read Moriarity v. Meyer, 21 N. M. 521, 157 P. 652, L. R. A. 1916E, 1165, and Kirkup v. Anaconda Amusement Co. 59 Mont. 469, 197 P. 1005 (annotated in 17 A. L. R. 441) they are against respondent upon the facts in this case. In all of these cases the contracts held adopted by the corporation were contracts wherein all the agreements and covenants assumed by the adopting corporations were such as they could lawfully and properly enter. Not so here. Had Samels, instead of executing the lease and modification thereof, entered an agreement with O'Toole for such lease and modification and then, had the bank entered, occupied, altered, received, and paid rent precisely as was here done, would any court have decreed specific performance thereof by the bank at the suit of O'Toole? We think not. Plaintiff also claims support from Lake Harriet State Bank v. Venie, 138 Minn. 339, 165 N. W. 225; Venie v.

Harriet State Bank, 146 Minn. 142, 178 N: W. 170. There seem to have been agreements in respect to the property involved which Venie violated for his own profit. The questions here involved were not raised.

We consider appellants upon this record to be entitled to findings in their favor and to judgment that plaintiff take nothing by this action.

The order is reversed and the case remanded with direction to amend the findings in accordance with this opinion.